Thank you. May it please the Court, Bob Newell appearing for appellants and defendants in this case. The history of this case is one of confusion, starting with the plaintiffs' eleven claims and nine defendants. It was sorted out, summary judgment, and they dismissed a couple of defendants. The trial court dismissed two defendants, and Dr. Vick and Ms. Joyer were held not to be liable by the jury, leaving Legacy and Ms. Weisgaber in the case. I would like to talk about two grounds for reversal in the case. The first is, and we've addressed this in the brief, the insufficiency of the evidence, and I think the task here is for to pull apart the tangled web of confusion. I had a little trouble doing that because in the excerpts of record I didn't find a lot of trial transcript to support your evidentiary claims. Did you give us all that there was that was relevant? I believe so, and I think the reason for that, Your Honor, is that there is very little evidence to support the claims that are left in the case by the jury verdict. Maybe you can be specific. I actually went and looked at the whole trial transcript because I thought that the excerpts were a little thin for reversal on insufficiency of the evidence. I was trying to find it in the trial transcript. Maybe you can point us to what you think is missing because it's hard to understand that from the excerpts. Okay. First of all, you have to look at what the case or the claim have to be. There has to be, and the plaintiff voluntarily limited it to improper means, so improper purpose doesn't play a role. Improper means were alleged to be a misrepresentation or injurious falsehood, and the one piece of evidence that they can point to, that they did point to in their brief, that doesn't relate to Dr. Vick or Ms. Joyer is Luzanne Weiskaver's alleged lie where the plaintiff came to her and said, are there any problems on the unit, and she said no. The problem, and that's all the evidence there is of any improper means. The reports that she gathered from various employees about flirtatiousness or over socialization, those kinds of things, were corroborated by Dr. Trinsky, Dr. Girolami, and Dr. Vick independent of anything Ms. Weiskaver communicated to them. So what we're dealing here is with an absence of evidence in the record, and that's the reason the record is thin on it. The lie doesn't work for a couple of reasons, because it was if you have A doing business with B, and B doing business with C, in order for A to interfere with B's relationship with C, A's got to communicate or somehow interrupt that relationship. Here what we have is A communicating with B, and B and C's relationship coming to an end. There's no connection there when Ms. Weiskaver lied, if you will, to the plaintiff. The other reason that that doesn't work is the plaintiff didn't believe it. In order for it to be effective as improper means, it has to be a deceit or a misrepresentation leading to some action or inaction on the part of the hearer. Here the plaintiff knew before she went to Ms. Weiskaver that there were problems. She knew afterwards because she went directly to Dr. Conger and talked to him about that. She was frustrated and consequently wrote a letter saying that she acknowledged the tension on the unit and agreed to stop rounding, except on her patients. So that's the only evidence there is of improper means in relationship to the WHA group, which is really what this case is about. There were allegations in the trial court that another relationship that was interfered with was with her patients and with the children's clinic, and even a hint, if you will, in the trial court record of interference with legacy, but she didn't have any economic relationship with legacy. With the patients, the only testimony on that score was that her patients came in and said they supported her and they talked about communications with different folks at legacy. The only communication with Ms. Weiskaver that could even come remotely close to an improper means was where she said that, you know, you wouldn't want anybody dealing with your baby who hadn't been credentialed. There's no falsehood there because at the time the plaintiff was not credentialed. So when you pick it apart and you go through each party and each claim and each defendant, you find that the evidence as to each one is nonexistent, at least not sufficient evidence that it would allow a reasonable juror to hold against them. Let me ask you, what the district court held was essentially that first she, Weiskaver left misled volm and then she, according to the district court, pressured the pediatricians to stop using the services and then made these statements you're talking about to patients which they said weren't defamatory but put all this together was enough. Why isn't that enough? It's not a lot, but why isn't it enough? For two reasons. One, what she says to the patients has to be wrongful. It has to be wrongful. Her pressuring the pediatricians is nonexistent. She didn't meet with the pediatricians. Vic and Joyer did. There's no evidence that any of their statements were wrongful. Vic and Joyer were both exonerated by the jury. So again, you have to look at each step of that. You don't get to mash it together and come up with enough to constitute improper means. So I hope that answers your question, but I think when you look at that record and look at what was said, what was done, it's insufficient to support that jury verdict. And on the patients, you're saying that even though the implication is that she's unqualified, that there's nothing improper about it because she can just make the credentialed statement and the abstract. Right. And that's part of it, but the other part is there's no evidence whatsoever in the record that she suffered any damage flowing from any interference with the relationship with a patient. Absolutely none. There wasn't even any offered. On the point about the lie, the interference with WHA, it's not a good point. It's not a clear indication, but there's some indication in the record that the jury didn't believe that there had been anything wrongful other than that lie because they found in connection with the credentialing of Dr. Unrau that everything that was done was done in good faith. And all of that evidence that went to the credentialing committee included all the evidence that went to Weisgaber except the lie. So it's not conclusive, but it's some indication that the jury focused on that as well. The plaintiff in her brief admits that the verdict rests upon some of the actions of Vick and Joyer, and we've pointed out in our reply brief why that's improper. They were actions can't be used to support a judgment against Legacy or Weisgaber. Let me ask you this. If there wasn't enough for them individually to be found liable, but portions of what they did combined with Weisgaber, would that be an appropriate way of analyzing the evidence? I don't think so, Your Honor, because if they didn't do anything wrong, you can't add nothing to something else to get it over the top on the scale. Well, what if they might not have done anything wrong that would be sufficient to hold them individually liable, but nonetheless they did some things that this just, I'm just relaying it out there for discussion purposes, if they were to do some things that were nonetheless improper but not to a degree that the jury felt that they should be individually liable, can you take, in effect, the sum of the parts to equal something larger than the individual parts? No, I don't think you can. And what's the best authority for that proposition? I'm not bringing the case to mind, but we cited in our brief the cases that say you can't, if the individual who's acting on behalf of a corporate body is not liable, then the corporate body can't be liable, unless there's other... But see, that's different. My hypothetical, or at least what potentially presents itself here, it's not like one person is not liable and therefore the corporation can't be. It's that you have an amalgamation of events. Maybe there's no cases on that, I just don't know. Yeah, on that precise point, I don't know that there are. I mean, I'm not sure how you would get to that point when you have statements from individuals. Maybe, I guess it's theoretically possible that you could pull a bunch of statements together and somehow they would constitute one injurious falsehood. Couldn't it be that the jury could have concluded that Weiscarver was the leader, exonerated the others, but they were participant in what she was doing and therefore she acted through or by them? I don't think so, because there was no evidence that they were acting on behalf of Legacy. So you'd have to look at... They weren't her agent and they weren't Legacy's agents. They were acting on behalf of WHA in various actions or on behalf of the medical staff. As Dr. Drolomey said, that's a separate and independent body. I don't think that gets you there. There's no evidence that any of this stuff was the means of interference. The evidence was that Dr. Shrinsky made his own investigation and decided, I've had it. I'm not going to do it. He terminated the sponsorship. That's really where the damage flowed from, to the extent there was damage, was in her not being able to go into the hospital to see patients. The second issue that I'd like to talk about briefly is the immunity statute under Oregon law. It's our position that the case has to be reversed because this statute makes everything that was said and done in the case subject to the immunity provision of ORS 41.675. The trial court did not accept that argument, but the language of the statute is quite clear. I'll just take the operative parts of it, which say that a provider of medical services in connection with quality assurance, credentialing, education, training, supervision, or discipline of physicians or other health care providers is immune from civil action when such a person is, that's a peer review body. That's the definition of it. When any person communicates information to a peer review body, they're immune from civil action. It's a very broad statute. The threshold is good faith, and that good faith determination along with the untangling that we talked about in the liability aspect was not done by the trial court because the verdict form was inadequate to achieve any of that. Did these issues come, these statements come while Weiscarver was serving on a communicating information to a peer review body conducting an investigation? No. The statute says, first of all, Weiscarver herself is defined as a peer review body. Dr. Vick, Dr. Girolami, Dr. Shrinsky are all peer review bodies under the definition in the statute, as is the credentialing committee and so on. Any person serving on or communicating information to any peer review body shall not be liable for an action for civil damages unless they do it in bad faith. So you're saying a hospital manager communicating with a doctor is within the statute, peer review body to peer review body? No, a hospital manager I don't think is a peer review body, and it doesn't have to be. Where does she come within the peer review body definition under 41675.1? Ms. Weiscarver? Yes. The definition of peer review body includes a provider of medical services in connection with quality assurance, credentialing, education, training, supervision or discipline of physicians or other health care providers. So the plaintiff qualifies as a health care provider, and Ms. Weiscarver is in section 5 of the statute that qualifies her for immunity because she's communicating with them in good faith. But it has to be communicated in connection with the grant, denial, restriction or termination of privileges. No, it doesn't. It goes beyond that. That's one of the realms of it, but it can also be in connection with medical research, quality assurance, utilization review, credentialing. I've had some experience with this statute before, and under your proposed interpretation, virtually anything would come under training and supervision, so it would mean virtually any statement made in the course of hospital or health care services would be under the position. Essentially. And it doesn't cover talking about the ballgame last weekend or anything like that. It has to be in connection with discipline, supervision, discipline, that sort of thing. But if it is, the legislature has made the decision that once you get past the threshold of good faith, whatever goes on in the promotion of health care is immune. That's a policy decision that they can and have made, and I don't think it takes interpretation. I think it just takes a plain reading of the statute. Do you have any case in Oregon that interprets the statute that way? No, there are no cases on it, Your Honor, unfortunately. I wish there were. I'd like to reserve the remainder of my time for rebuttal if I may. Could I just ask one fact question? Sure. Did Dr. Weiss-Caber communicate to anyone other? I thought there were communications with patients. I didn't hear the last part. Communications with patients. In other words, people who fall outside a definition. She did. She communicated with a couple of patients, and I can't give you the precise site, but that's indicated in the briefs. And that's the point that I mentioned before about it doesn't rise to the level of improper means. Good morning, Your Honor. May it please the Court, I'm Craig Crispin on behalf of the plaintiff and respondent in this action, Lori Vaughn. It's very easy for counsel to get up here and say there's no evidence. This was a trial of six days, I believe. There  record site goes to six volumes, if I recall correctly. And throughout the record are statements and testimony that address the kind of conduct that Legacy, Meridian Park Hospital, and their agents, Weiss-Caber, Vick, Joyer, all took to cause this plaintiff to be unable to do her job. Now, in terms of citing those things out, we have set out some materials as a fact situation at the beginning of the brief, but I think one thing that maybe is an initial threshold concern for the Court, or might be, is just what in the record is available for a defendant to disregard totally, as they seem to have disregarded most of the things that are otherwise favorable to plaintiff. Their argument is that because Vick and Joyer were not held liable for the entire claim against them, that this Court should disregard everything in the record that is otherwise favorable to plaintiff that connects up with Vick and Joyer. And that just defies logic. The statement of the standard of review for what this ruling party is to take those facts and inferences in the light most favorable to it. On the record as a whole, it doesn't say because one person was not, didn't meet the preponderance of standard on one part of the evidence, or the jury just didn't decide that something was met exactly, that suddenly those facts must be construed in the light most favorable to defendant. That's not what the cases say. The first argument is that the statements from whomever, Weisgarber or others, to your client misleading or whatever they might be, they don't really matter because they don't kind of trail over to the legacy or the hospital. What is your response to that? Weisgarber was acting. She was an employee of the hospital and employee of legacy. What she did is attributable to the legacy and Meridian Park Hospital. If she says something to Ms. Bohman, misleads her, but nothing is done about that, is it sort of neither here nor there evidence? I don't think it is at all. With Ms. Weisgarber, what she did was set up a very long and over the course of a year's effort to mislead Ms. Bohm, but not only her, but also the other people that were involved with Ms. Bohm. I'm only sticking with Ms. Bohm. She misleads Ms. Bohm and the question is so what? It's bad manners, but is it legally cognizable? If that was the only thing that happened, I wouldn't say so. Now let's go to the next one and that is the patients. The argument there which would be helpful to hear from you on is yes, there were some statements made to patients, but they never went anywhere. In other words, nobody quit coming to her or complained or anything else. The statements made to the patients essentially were that Ms. Bohm shouldn't be allowed to touch them in the inference of what was actually said to her. Again, unprofessional perhaps, but did they have any effect on her statements made to patients? Did they have any effect on her ability to keep providing services? I don't think you can parse out like this. I'm just asking if there's anything you can point to. I'm not saying you can't put it all together. We're not there yet. I'm just asking you about the patients. Do we have anything from the patients that's linked up to her ability to continue to provide services? Well, obviously she could not perform services any longer in the hospital to the people that wanted to see her there. The statements to the patients and the similar statements back to the other providers stopped her from being able to do anything in the hospital. Even going in as a visitor might. Those weren't based on statements to the patients. Those were based on the pulling of her privileges, right? Well, I don't know. They were not based on the statements so much, but she was not allowed to continue doing what she had done and what she wanted to do for the patients she still was entitled to work with at the children's clinic, for example, because she could not go in and sit with them, even visit them, or try to create a relationship by continuing their social relationship, even if it was that much, in the hospital so that they would be able to use her services after the hospital once the child-parent dyad created a need. Legacy was there to take over, and they had no ability to see her and establish some kind of a continuing relationship with that dyad because Legacy had already got it. Well, that comes to the third one, and that has to do with pressure on pediatricians or other doctors. Legacy says, well, she, Ms. Weiscarver, didn't do anything. It was only Dick and Joyer. And that then comes to your position that you can put all this together and make kind of, you can weave the fabric together. So you don't have to take them one by one. So my question there is, we do have these cases that suggest if an underlying defendant doesn't have any liability, then you can't in effect go up the chain and hold the parent or the corporation liable. Are there some cases that talk about your position, which is basically you can take a little bit from each one, even if individually it wouldn't have been enough to sustain personal liability? Well, the first thing that comes to mind is something I don't think we addressed in any of the briefs I saw. It's in the employment field. It's where I do most of my work. And there are plenty of cases which talk about the decision-maker who might be completely free from bias of any kind, and yet biased input from the supervisors creates a liability. And that's how they get to the non-biased supervisor, is by the input from others. Now in Weiscarver's case, she's giving this input, false information, the jury found, to Joyer, to Dick, finding that there were these issues and problems, yet nobody could come up with any concrete examples of these problems. Just by multiple efforts by plaintiffs to find out what the concerns were, they all were these vague generalities. Weiscarver told her at one point that there were no problems on the ward. And I wanted to say one thing about that before we pass on, and that is the jury could have believed her or believed that she lied. Either way, the testimony was there. They could have concluded that that's true, there were no problems on the ward. Now she testified she lied, but the jury is entitled to take the fact that she's a liar and apply it any way they want to in that case. So it doesn't necessarily mean that because she admitted she lied that there were any problems. The jury is entitled to say that there weren't any, and to take her by her word, even if she now says she's lying. Did she need to communicate those problems to somebody in order to have improper means? In other words, if it was just a fight between the two of them, we wouldn't have a lawsuit, presumably. But how do we know she communicated? What do we look to in the record? We have a 1998 meeting and a 1999 meeting. I believe they're both in December. And there's plenty of documents about both of them in the record, both from the perspective of the participants on the hospital side and from Ms. Bohn's side of what occurred in there. One's interesting in that the follow-up memo in January is a completely different version than what the documents show in December. Weisgaber's right in the middle of all of those. She's the one that's participating. Dr. Vick might be there participating in the meeting, but Weisgaber's the one that's sitting right there in the same meeting with them, participating and providing these broad, general statements about concerns that they couldn't back up with examples. When they could back up with examples, it was, she's not wearing name tag. The other part is, if that's enough to say that she should be taken out of the hospital, I don't know how anybody can survive. But I want to go back just for one point on the patient. We have testimony, and this is around page 601 and 606 of the transcript, where we've got testimony by the patient who's crying when the plaintiff told her she would not be able to see her in the hospital, called the hospital complying. But there's immediate impact right there that she's not able to do it. 557, 77, and 606. There are other calls to the hospital by patients who knew at that point they could not go in and see her. So there was a direct impact on patient care, patient access by the plaintiff. Is there any communication between Weisgaber that, assuming that the immunity statute sweeps as broadly as counsel argues, are there any statements by her that under that broad reading would still not be immunized because they went beyond that protected group? It would be hard to imagine, because under the defendant's interpretation, everything that's uttered in that hospital or about the hospital is proven. To the patients, and also on Weisgaber, I'm trying to remember whether she actually went out there or contacted the children's clinic to try to persuade them not to do business. That may have been Ms. Joyer, though. I can't quite remember on that one. The patients obviously would have been something that's not within the peer review. And also on that point, if I might, just for a second, counsel talks about the plain language of the statute, but let me just look at the statute. Two things to mention about it. Number one is that in subsection 6 of ORS 41.675, it excludes out a practitioner's contested denial, restriction, or termination of clinical privileges. If the statute applies otherwise, that should take this case out of that statute. But I don't even think that applies, because Ms. Bohm does not meet the definition of a health care provider. Wait a minute. Let's take your argument. Subsection 6 says subsection 3 does not apply. That's the privilege and admissibility. That's the effect of, if it's in front of a peer review body and section 3 takes it out. If the argument is right, then the argument in section 6 takes it out. But another section that defines health care providers, that's ORS 192.525, subsection 9, and defines health care provider as a person licensed  under the agency. And Ms. Bohm was working not as an employee of anybody, but rather as a contractor. In the plain terms of that definition, she does not apply. They're saying that Ms. Weiscarver is the health care provider, I think, under subsection 1. This whole section doesn't apply if Ms. Bohm is not a health care provider. If this is the basis for their immunization, as it were, is it subsection 3 that provides that immunization? Is that what you're saying? But it says that the evidence cannot be admitted. Right. I'd like to get to that, because then it's not an immunity, it's an evidentiary privilege. Was there any objection to this evidence coming in? Well, there's objection to virtually everything. Based on this statute. Did they object to the testimony coming in? They objected at the beginning that virtually everything that was said, if your position is here. So they preserved their objection that if Weiscarver fits within this statute, then any statements by her to anybody else who constituted a peer review body were inadmissible in this trial.  I think to preserve that argument. And the argument in the statute is that there can be none because Ms. Bohm was not within the terms of the statute. If there was testimony in which Weiscarver's critical statements about Bohm were transmitted to a doctor, Okay. And we read the statute broadly, then it seems under the language of the statute that evidence would be inadmissible because it's not supposed to be admitted in a judicial proceeding if it's peer review body to peer review body. Agreed? So you're disputing whether the statements that came in fall into the statute because at least one of the two parties wasn't a peer review person. And that the statute does not apply to comments about Ms. Bohm because she's not a health care provider. I understand your argument. But I'm having, you know, the statute's not that great because it has these definitions, but then it kind of jumps to the result. My question is, where does it say she needs to be within the definition of a peer review body? Going down where it, where counsel read, he read for quality assurance, utilization review, credentialing, education, training, see that language? Yes. And then right after that it says. I'm sorry, where are you? It's probably. No, just give me the site. What of the. 41.675. I got that. Sub 1. Sub 1, okay, thank you. And then it refers to services in connection with bona fide medical research, quality assurance, utilization review, and goes on and then it says or discipline of physicians or other health care providers or in connection with the grant denial restriction or termination of clinical privileges at a health care facility. She is not an other health care provider and she was not granted privileges. Okay. Supervisor for the exact clear terms of the statute may not even apply to Ms. Bohm. That wasn't so hard, was it? Don't. Next time. Don't fight with me. It's a big statute. It is. Dr. Unruh. Is that how you say it? Unruh. Unruh is the doctor that was at issue. Is that right? She made an attempt to credential afterwards. The jury found that her credentialing process was not done in bad faith and we're not challenging that particular decision. And what was the site for the definition of health care provider? ORS 192.525 paragraph 9. Thank you. The last thing I'd like to comment about is just again the standard review here in terms of what evidence can be used. We have a failure to object to the causation element and of course that subjects the review to any evidence standard and the issues that they did preserve go to the substantial evidence on the record even if the jury or a different jury could have reached a different determination. In this case, with regard to causation, we'd say that there's plenty of evidence that the impact of the interference by Weisgaber alone and in conjunction with the actions of Dick and Joyer most notably in going to the Children's Clinic and trying to get them not to do business and with Dr. Vick who's acting on behalf of the hospital as head of the department, withdrawing brochures from WHA, Women's Health, and instructing his partners not to do business with her. When he's wearing that hat as head of the department, he was at the hospital. These evidence of causation and evidence of interference are more than adequate to meet standard property. Just to cover a couple points very quickly. First of all, this is not an employment case. That's part of the problem in the trial court. There was no evidence of economic damage flowing from any interference with the patients. There may have been some causation argument. We put in the brief as a precaution. I don't think it matters because the issue is improper means. It may be improper, but if it's not the means, I think we preserve that in the trial court and the same standards should apply. On the statute, I want to address this because it can be confusing. It's not Ms. Volm who has to be a health care provider. It's Dr. Schwentzke, her sponsor. He unquestionably is. So is Ms. Weiskaper. She is what's called a dependent allied health provider under the hospital bylaws. She is a part of him. If he's a health care provider, she is because they're inseparable as far as the statute is concerned. The court is correct. Sub 3 has nothing to do with this as does sub 6 because that's an evidentiary issue, not the immunity issue. Furthermore, it's communicating to that gives you the immunity. And Ms. Weiskaper was undoubtedly communicating to Vic and Gerolami in their capacities with the medical staff. Now where do you derive the difference between the immunity and the evidentiary portion of the statute? Subsection 3 is evidentiary. Subsection 5 is the immunity. The issue about Ms. Weiskaper's statements in the December meetings, 98 and 99, is a red herring because Dr. Vic and Dr. Gerolami did their own independent investigations. And let's assume that everything she said was false. Then you've got the fact that Vic and Gerolami acted on their own investigations. There's no evidence that anything she said influenced their actions. And the evidence was uncontradicted that what they found was exactly what had been reported to them by Weiskaper. So you don't have the improper means. That's the problem with the conflation of the evidence that plaintiff has tried to do and that's why it's necessary to pick it apart. If we find out that if we were to sustain the jury verdict there's enough evidence to find improper means, wouldn't that gut your argument no matter how you construe it with the jury? I'm glad you asked that question because I think it does not. The two are not the same. You could have, for example, improper means says violation of a common law rule or a statute. You could have a violation of a privilege provision, for example, that would be inadvertent and perfectly in good faith. But we don't have any of those things here. What we have is more akin to the standard good and bad faith. We don't know because the verdict form didn't allow us to find that out. We don't know. We don't have evidence of those other things. In other words, it's not in the trial. So we wouldn't want to go off and try to figure out if they were relevant because the jury didn't hear about any of that. That's true, but we don't know what the jury did rely on. And if you said, as Judge Fischer has indicated, that you sustained the verdict, the improper means does not equate to bad faith under the statute. We asked that it be parsed out by defendant by claim and relationship. Okay. Let me back up. To what extent was the jury asked or not asked, but you asked that it be asked, whether or not the parties that they had to adjudicate liability for who you claimed should be protected by the Oregon statute, to what extent were they asked to focus on whether or not the statements were made in good faith? We asked for that. I would have to get back to you with a precise site to it, but I don't think the submitted verdict form that we offered. It would have to be before verdict form. What about jury instructions? We did ask for jury instructions. We asked for rulings by the court at various motion stages and so on. All right. Thank you. The case of Boehm v. Legacy Health System is submitted. Thank you for your arguments this morning, and we're adjourned. All right. The score for this session stands at. .
judges: Goodwin, McKeown, Fisher